23CA1574 Peo v McLean 07-02-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA1574
Arapahoe County District Court No. 21CR2216
Honorable Shay Whitaker, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Mickel McLean,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE MEIRINK
Pawar and Sullivan, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 2, 2026

---

Philip J. Weiser, Attorney General, Rachel Lieb, Assistant Attorney General II, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Claire Pakis, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Mickel McLean, appeals the trial court's judgment of conviction entered on a jury verdict finding him guilty of second degree assault, third degree assault, illegal discharge of a firearm, two counts of domestic violence, and three counts of reckless endangerment.  We affirm.

I.     Background

¶ 2     In October 2021, McLean and his girlfriend, Nancy Allen, got into a verbal altercation in their apartment.  The fight got physical and McLean decided to leave the apartment.  While McLean was retrieving his belongings from a closet, including his clothes and a handgun, he and Allen had a physical "tussle" and the gun fired.  Neither McLean nor Allen was shot, but the bullet went through the wall into the neighboring apartment and struck S.S. in the head.  After seeing the bullet hole in the shared wall, McLean ran to the neighboring apartment to check on his neighbors and called the police.

¶ 3     Deputy Bjorn Lickteig arrived at the scene, handcuffed McLean, and transported him to the Arapahoe County Sheriff's Office (ACSO) headquarters for questioning.  At ACSO headquarters, Investigator Charles Kelley reviewed McLean's

*Miranda* rights with him, which McLean later waived. Lickteig and Kelley questioned McLean for about an hour. During the interview, McLean admitted to the officers that the gun was in his hands when it fired and that it was his fault that S.S. was shot.

¶ 4    The prosecution charged McLean with (1) first degree assault; (2) second degree assault; (3) menacing; (4) illegal discharge of a firearm; (5) third degree assault; (6) three counts of reckless endangerment; and (7) two counts of crime of violence sentence enhancers.[1] At trial, defense counsel argued that McLean didn't have the requisite mens rea to commit any crime and that the gun fired accidentally.

¶ 5    The jury acquitted McLean of first degree assault but convicted him of second degree assault, illegal discharge of a firearm, third degree assault, two counts of domestic violence, and three counts of reckless endangerment. McLean was sentenced to community corrections for five years.

---

[1] The prosecution dropped the menacing charge before trial.

II.    Analysis

¶ 6    McLean raises two issues on appeal.  He contends (1) that the statements he made during his custodial interrogation were involuntary and should have been suppressed and (2) that the trial court abused its discretion by redacting part of his custodial interrogation.  We disagree with both contentions.

### A.    McLean's Statements Were Voluntary

¶ 7    McLean's theory of defense was that the gun went off accidentally during the tussle with Allen and that he never intentionally pulled the trigger.  He argues that, during his interview, Kelley coerced him into changing his story — to the gun going off when he hit Allen on the leg — and that because his statements weren't made voluntarily, they should have been suppressed.[2]  We disagree.

### 1.    Standard of Review and Applicable Law

¶ 8    We review a trial court's ruling on a motion to suppress as a mixed question of law and fact.  *People v. Ramadon*, 2013 CO 68,

---

[2] In his motion to suppress, McLean argued that the entire video of his interview should have been suppressed, but on appeal, he clarifies that "all statements made after 28:44 in People's Exhibit 7 should be suppressed as involuntary."

¶ 21. We defer to the trial court's factual findings and uphold them when they are supported by the record. *Id.* But we review the legal effect of the facts de novo. *Id.* Where the interrogation has been audio- or video-recorded and there are no disputed facts outside the recording pertinent to a suppression ruling, we are in the same position as the trial court to decide whether a statement was voluntary. *Id.* In such instances, the question on appeal is one of law and is reviewed de novo. *See People v. Valdez,* 969 P.2d 208, 211 (Colo. 1998); *People v. Wickham,* 53 P.3d 691, 694 (Colo. App. 2001).

¶ 9 A defendant's involuntary statements are not admissible evidence. *See* U.S. Const. amends. V, XIV; Colo. Const. art. II, § 25; *Mincey v. Arizona,* 437 U.S. 385, 387 (1978); *People v. Raffaelli,* 647 P.2d 230, 234 (Colo. 1982). In determining whether a statement was voluntary, courts consider the totality of the circumstances and focus on whether the officers' behavior overcame the defendant's will and resulted in an inculpatory statement that wasn't "freely self-determined." *Ramadon,* ¶ 20.

¶ 10 This analysis requires a two-step inquiry, asking (1) whether the official conduct was coercive and (2) whether the coercive

4

conduct "played a significant role in inducing the statements." *People v. Munoz-Diaz*, 2023 COA 105, ¶ 14 (quoting *Ramadon*, ¶ 20). Both steps of this inquiry require consideration of several nonexhaustive factors:

(1) whether the defendant was in custody;

(2) whether the defendant was free to leave;

(3) whether the defendant was aware of the situation;

(4) whether the police read *Miranda* rights to the defendant;

(5) whether the defendant understood and waived *Miranda* rights;

(6) whether the defendant had an opportunity to confer with counsel or anyone else prior to or during the interrogation;

(7) whether the statement was made during the interrogation or volunteered later;

(8) whether the police threatened the defendant or promised anything directly or impliedly;

(9) the method or style of the interrogation;

(10) the defendant's mental and physical condition just prior to the interrogation;

(11)  the length of the interrogation;

(12)  the location of the interrogation; and

(13)  the physical conditions of the location where the

interrogation occurred.

*Cardman v. People*, 2019 CO 73, ¶ 23; *see also People v. Zadran*, 2013 CO 69M, ¶ 11 (listing the same thirteen factors).

¶ 11     Whether a statement was made voluntarily isn't determined by "rote tabulation" or a "mechanical[] tally" of these nonexhaustive factors but on whether the officers' conduct "actually overbore" the defendant's will. *People v. Liggett*, 2014 CO 72, ¶ 35 (quoting *People v. McIntyre*, 2014 CO 39, ¶¶ 19, 20 n.2).  Thus, the relevant question is whether the officers used the pressures inherent in custody to extract statements through intimidation, domination, or manipulation.  *See People v. Gonzales*, 987 P.2d 239, 242 (Colo. 1999).  Coercive conduct includes not only physical abuse or threats directed against a person but also subtle forms of psychological coercion.  *People v. Gennings*, 808 P.2d 839, 843-44 (Colo. 1991).  The deliberate exploitation of a person's weakness by psychological intimidation can, under some circumstances,

constitute a form of governmental coercion that renders a statement involuntary.  *Ramadon*, ¶ 19.

### 2.  Additional Applicable Facts

¶ 12    Shortly after the shooting, Deputy Lickteig drove McLean from his apartment to ACSO headquarters, where he was placed in custody, for questioning.  The entire interview was captured on Lickteig's body-worn camera.  Investigator Kelley was also present at the interview and conducted most of the questioning.  Before asking questions, Kelley read and explained McLean's *Miranda* rights.  McLean waived his *Miranda* rights and his right to an attorney orally and in writing.  The interview lasted approximately one hour.  McLean wasn't handcuffed during the interview, he was free to move around the room, and the door remained open for the duration of the interview.

¶ 13    McLean told the officers that, after he and Allen started arguing, he told Allen that he was leaving.  McLean went into the closet to collect his things, and as he was pulling his clothes and gun from the top shelf, Allen pulled him backward and the gun accidentally went off as he caught his balance.

¶ 14     Kelley told McLean that his observations at the scene didn't align with McLean's description of the event.  Kelley believed that McLean didn't intend to fire the gun but that "guns just don't go off like that."  McLean then said, "I don't know if my finger automatically touched the trigger or something like that . . . my hand was on it; my hand was on it Mr. Kelley . . . .  If my hand actually accidentally grabbed the trigger, I'll pay my penalty for that."  Kelley told McLean that he shouldn't "make it worse by lying."  Kelley insinuated that McLean was "pissed off" and "couldn't take it anymore" because McLean and Allen were struggling with their relationship, their daughter had recently died, and McLean "had a momentary lapse of judgment."

¶ 15     Kelley also said that he was "trying to help [McLean] out" by encouraging him to be honest.  As McLean sat on the floor of the room, Kelley leaned over McLean and said,

> I saw a pendant of Jesus Christ, right?  I'm a believer, and you're a believer, and [Lickteig] is too.  Lies only make things worse.  I'm asking you to take a leap of faith and tell me, exactly, because I already know what happened.  I'm asking you to take a leap of faith, no matter how bad you think it makes you look.  All I'm asking for from you is the truth.  We can work this, we can work this together.

8

¶ 16    Several minutes later McLean reenacted the event with a fake gun. McLean stood up to demonstrate and said that he used the "back part" of the gun to hit Allen's leg while his hand was wrapped around the gun. McLean surmised that when he hit Allen, he must have pulled the trigger.

¶ 17    Before trial, McLean moved to suppress the statements he made during the interview, arguing that they were not made voluntarily. The trial court reviewed the interview video recording and held a hearing on the motion, at which Lickteig and Kelley testified.

¶ 18    Ultimately, the court found that McLean's statements were voluntary and denied the motion.

### 3.    Discussion

¶ 19    While McLean doesn't suggest that the officers physically threatened or intimidated him, he asserts that, under the totality of the circumstances, their conduct was psychologically coercive because (1) the officers repeatedly told him that he was lying about his version of events; (2) Kelley's tone began to increase in volume and hostility at the midway point of the interview; (3) McLean was in a fragile mental and emotional state during the interrogation;

and (4) Kelley mentioned the death of McLean's infant and tried to appeal to McLean's religious beliefs to get him to "tell the truth." Based on our review of the interview, we conclude that the statements were voluntary.

¶ 20     As an initial matter, it is undisputed that McLean was in custody at ACSO headquarters, he was aware of the situation surrounding his arrest, he had been read his *Miranda* rights, he understood and waived his *Miranda* rights, he was offered a lawyer but waived his right to speak to one, he made his statements during the interrogation, and the interrogation lasted for approximately an hour. While those factors may have communicated to McLean that he wasn't free to leave, they don't establish coercion. *See People v. Helm*, 633 P.2d 1071 (Colo. 1981).

¶ 21     The record reflects that, once the interview began, the officers reduced many of the pressures ordinarily associated with custodial questioning. For example, they removed McLean's handcuffs, left the interview room door open, advised McLean that he didn't have to answer questions if he didn't want to, and concluded the interview when McLean indicated that he wanted to end it. The record also demonstrates that McLean understood the purpose of

the interview and his *Miranda* rights and that he waived them and his right to an attorney. The officers didn't imply that McLean was expected to sign the waiver; instead, they told him to sign only if he wanted to. When the officers asked if he understood why they were speaking with him, McLean responded that "its y'all job" and that he understood the officers needed to determine whether he was "telling the truth" or "telling a damn lie."

¶ 22    McLean's argument that Kelley engaged in implied threats and promises when he told McLean that he was lying is unavailing. Although Kelley challenged portions of McLean's story and urged him to tell the truth, courts have consistently held that the "soft technique" of encouraging a defendant to tell the truth doesn't overbear "the defendant's will as to have caused the defendant's statement to be constitutionally involuntary." *People v. Theander*, 2013 CO 15, ¶ 45 (quoting *Gennings*, 808 P.2d at 846-47) (finding the defendant's will was not overborne when officers encouraged the defendant to tell the truth for her children's sake); *see also People v. Miranda-Olivas*, 41 P.3d 658, 662 (Colo. 2001) (finding no coercion when police encouraged the defendant to tell the truth to clear his girlfriend's name).

11

¶ 23    Likewise, the officers' statements that "we can work this together" weren't promises because the officers never promised McLean leniency or that the outcome of the investigation was dependent on McLean's confession. Courts have determined that similar statements made to elicit cooperation from a defendant weren't coercive. *See, e.g., Zadran*, ¶ 19 (concluding that statement made by an officer that "it would be in [the defendant's] best interest" to speak wasn't coercive); *People v. Sellers*, 2022 COA 102, ¶ 13 (holding that officer's statement, "I'm going to make sure that you get a fair shake," wasn't coercive), *aff'd on other grounds*, 2024 CO 64; *cf. Cardman*, ¶ 28 (finding that police interview was coercive when detective conveyed to the defendant that "the case would go away and would not proceed" if the defendant "met [him] halfway" and apologized to the victim).

¶ 24    McLean asserts that Kelley's hostile tone midway through the interview was coercive and caused McLean to change his version of events. This argument is unpersuasive. Although Kelley's tone may have seemed "confrontational" at one point during the interview, we agree with the trial court that "the officers . . . maintain[ed] their distance" and that the tone was conversational.

Throughout the interview — and, importantly, before the twenty-eight-minute mark that McLean now challenges — McLean insisted that the shooting was accidental even while acknowledging that he was holding the gun. He also corrected Kelley when he believed that Kelley misunderstood him and modified his story on his own initiative. McLean's ability to disagree with and correct Kelley throughout the interview is inconsistent with the actions of a suspect whose will was overborne. *Cf. Ramadon*, ¶¶ 11-12 (concluding that investigator's accusatory tone and threats of violence that defendant would face from being deported or jailed if he didn't reveal the circumstances of the crime were coercive).

¶ 25    It is undisputed that McLean was distraught during the interview, but the officers didn't exploit his emotional state, nor were McLean's statements involuntarily made based on his distressed condition. Indeed, the record supports the opposite of what McLean asserts — McLean was allowed to sit on the floor when he became emotionally distressed, the officers gave him water, and he was allowed to remove some of his clothing when he became too warm. Moreover, "a defendant's weakened mental condition, in the absence of deliberate exploitation and intimidation

13

by law enforcement officers, is insufficient to render the defendant's statements involuntary." *People v. Cisneros*, 2014 COA 49, ¶ 84; *see also Colorado v. Connelly*, 479 U.S. 157, 164 (1986) ("[A] defendant's mental condition, by itself and apart from its relation to official coercion, should [n]ever dispose of the inquiry into constitutional 'voluntariness.'").

¶ 26　　Finally, although Kelley mentioned the death of McLean's infant daughter (as an acknowledgment that McLean was going through a difficult time) and McLean's religious beliefs, Kelley's references weren't coercive. They were brief, and Kelley didn't elaborate on McLean's daughter's death and didn't otherwise suggest that McLean should tell the truth out of a moral duty to her. *See, e.g., Cisneros*, ¶ 82 (finding that detective did not exploit the defendant's emotional and psychological vulnerability after the defendant watched his ten-year-old daughter die); *Theander*, ¶ 44 (concluding that it wasn't coercive for police to indicate that the children would want to know that the defendant had helped find their father's killer); *Munoz-Diaz*, ¶ 25 (concluding that the detective's appeal to the defendant's religion and the victim's family's need for closure didn't rise to police coercion).

¶ 27    Under the totality of the circumstances described above, we conclude that McLean's statements during the interview were given voluntarily and weren't coerced.

### B.    The Court Properly Redacted Part of McLean's Custodial Interrogation

¶ 28    McLean argues that the trial court abused its discretion by depriving him of the ability to present a complete defense when it redacted a portion of his interrogational video recording.  We disagree.[3]

### 1.    Standard of Review and Applicable Law

¶ 29    Trial courts have broad discretion in determining the admissibility of evidence based on its relevance, its probative value, and its prejudicial impact.  *People v. Ibarra*, 849 P.2d 33, 38 (Colo. 1993).  We review a court's evidentiary ruling for an abuse of discretion.  *Campbell v. People*, 2019 CO 66, ¶ 21.  A trial court abuses its discretion where "its ruling is 'manifestly arbitrary, unreasonable, or unfair,' or where it is based on an erroneous view of the law."  *People v. Elmarr*, 2015 CO 53, ¶ 20 (citation omitted).

---

[3] The parties disagree about the standard of reversal.  Because we perceive no error, we need not resolve this disagreement.

¶ 30    Unless otherwise prohibited by law, all relevant evidence is admissible.  CRE 402.  Relevant evidence is any evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  CRE 401. Relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice."  CRE 403.

### 2.    Additional Applicable Facts

¶ 31    Just before the start of trial, the prosecution moved to redact the portion of McLean's interview recording where Kelley mentioned that he and Lickteig shared McLean's Christian beliefs on the grounds that Kelley's comments were "prejudicial under [CRE] 403." Defense counsel objected, saying that "the content of those questions and the method which they [were] posed . . . during th[e] interview [wa]s highly relevant" to McLean's responses.  The trial court granted the motion and allowed the prosecution to redact approximately ten seconds of the video discussing Kelley's, Lickteig's, and McLean's religious beliefs, because the "religious

16

belief aspect . . . tip[ped] the scale a bit more in terms [of being] more prejudicial than probative."

### 3. Discussion

¶ 32 McLean's theory of defense was that the gun went off accidentally while he and Allen tussled over clothing and that he never pulled the trigger intentionally. He asserts that his story changed after Kelley mentioned McLean's religious beliefs. Under McLean's revised version of events, the gun went off when he hit Allen on the leg. He claims that by excluding the portion of the interview where Kelley invoked his shared beliefs as a method to get McLean to change his story, the trial court prevented him from presenting a complete defense.

¶ 33 But other than his conclusory statement, McLean doesn't articulate how the redacted portion impaired his ability to present a complete defense. In any event, his claim is unavailing because the right to present a defense isn't absolute and may be conditioned upon adherence to the rules of evidence. *People v. Cline*, 2022 COA 135, ¶ 77. Moreover, the record doesn't support McLean's assertion that he was unable to present a coercion-based theory of defense. McLean's counsel discussed the theory during opening statements

and closing argument. And counsel directed the jury to multiple points in the interview that, in the defense's view, demonstrated improper pressure by investigators.

¶ 34 Also, the isolated reference to religion occurred *after* McLean had already admitted to holding the gun and pulling the trigger.

¶ 35 We are not otherwise persuaded by McLean's reliance on *Crane v. Kentucky*, 476 U.S. 683 (1986), and *People v. Lopez*, 946 P.2d 478 (Colo. App. 1997). *Crane* and *Lopez* stand for the proposition that even if a court declines to find that a defendant's confession was involuntary based on coercive police conduct, the defendant still has the right to present evidence showing the jury that his confession was unworthy of belief, and exclusion of that evidence surrounding the circumstances of the confession deprives him of the right to present his defense. *See Crane*, 476 U.S. at 686-91; *Lopez*, 946 P.2d at 482.

¶ 36 *Crane* and *Lopez* are distinguishable from McLean's case. In *Crane,* the Supreme Court concluded that the circumstances of the defendant's confession were relevant because his entire defense was that there was no physical evidence linking him to the crime and his earlier admission of guilt shouldn't be believed because he was

a young, uneducated boy who had been kept in a small, windowless room for a protracted period of time until he confessed. 476 U.S. at 691. Similarly, in *Lopez,* the defendant requested and was erroneously denied the opportunity to present expert testimony on the circumstances surrounding his confession, including that his mother had threatened to kill him, herself, and his younger sister unless he spoke to the investigating officer and that he was interrogated for nearly thirty hours over a period of five days before confessing. 946 P.2d at 480-82.

¶ 37    In contrast to the defendants in *Crane* and *Lopez,* McLean had ample opportunity to present his argument that his story changed because of officer coercion. Apart from about ten seconds, the jury was able to see the entire interview, and it was able to assess the circumstances that yielded what McLean claims was a change in his version of events. Moreover, the probative value of the redacted portion was minimal. Although certain details may have changed, the core substance of McLean's confession remained consistent throughout the investigation: He acknowledged throughout his interview that the gun was in his hands and that he pulled the trigger, including before Kelley referenced religion at all.

¶ 38    In sum, the trial court acted within its discretion by weighing the probative value of the redacted portion of the video recording against the prejudicial effect of including it.  McLean was able to present his theory that the gun fired accidentally, and the exclusion of this limited portion of the interview didn't impair McLean's ability to present his case.  The jury was equipped to evaluate the substance of the interview and McLean's characterization of it.

### III.    Disposition

¶ 39    We affirm the judgment.

JUDGE PAWAR and JUDGE SULLIVAN concur.